WESTERN ORGANIZATION OF RE-
SOURCE COUNCILS, Jeanie Alder-
son, Wally McRae, Wyoming Outdoor
Council, Natural Resources Defense
Council, Powder River Basin Re-
source Council, Plaintiffs,

v.

BUREAU OF LAND MANAGEMENT,
Director, in her official capacity also
known as Kathleen Clarke, Bureau of
Land Management, United States De-
partment of Interior, Secretary, in her
official capacity, also known as Gale
A. Norton, United States Department
of Interior, Defendants.

v.

Lance Oil & Gas Company, Inc., West-
ern Gas Resources, Inc., Fidelity Ex-
ploration & Production Co., Pennaco
Energy, Inc., Marathon Oil Company,
State of Wyoming, Bill Barrett Corp.,
Devon Energy Corp., Williams Pro-
duction RMT Co., Intervenors.

American Lands Alliance, Biodiversity
Conservation Alliance, George
Wuerthner, Plaintiffs,

v.

Bureau of Land Management, an agen-
cy within the Department of Interior,
United States Department of Interior,
Secretary, in her official capacity, also
known as Gale A. Norton, Defendants.

v.

Lance Oil & Gas Co., Inc., Western Gas
Resources, Inc., Fidelity Exploration
& Production Co., Williams Produc-
tion RMT Co., Pennaco Energy, Inc.,
Marathon Oil Co., State of Wyoming,
Devon Energy Corp., Anadarko Petro-
leum Corp., Bill Barrett Corp., Inter-
venors.

Nos. 04–CV–18–J, 04–CV–19–J.

United States District Court,
D. Wyoming.

Johanna H. Wald, Natural Resources Defense Council, San Francisco, CA, Keith G. Bauerle, EarthJustice Legal Defense Fund, Denver, CO, Steve Jones, Wyoming Outdoor Council, Wyoming Outdoor Council, Lander, WY, Thomas Francis Darin, Jackson, WY, for Plaintiffs.

Carol A. Statkus, U.S. Attorney's Office, Cheyenne, WY, Lori L. Caramanian, Department of Justice, Environment and Natural Resources Division, Denver, CO, for Defendants.

Stephanie A. Reedy, Arnold & Porter, Carolyn L. McIntosh, Patton Boggs, David E. Brody, Denver, CO, Dana L. Hupp, Jon Metropoulos, Gough Shanahan Johnson & Waterman, Helena, MT, Keith Burron, Associated Legal Group, Cheyenne, WY, Amy B. Chasanov, John Charles Martin, Mary Beth Bosco, Patton Boggs, Washington, DC, Edward A. Strenkowski, Susan Brownlee Miller, Marathon Oil Company, Houston, TX, Thomas A. Nicholas, III, Hirst & Applegate, Eric Kaimond Nelson, Jay A. Jerde, Michael R. O'Donnell, Wyoming Attorney General's Office, Cheyenne, WY, for Intervenors/Defendants.

Charles A. Breer, Charles L. Kaiser, Davis Graham & Stubbs, Thomas E. Black, Jr., Williams Production RMT Company, Legal Department, Denver, CO, John W. Ross, Brown Law Firm, Billings, MT, Thomas A. Nicholas, III, Hirst & Applegate, Cheyenne, WY, for Intervenors.

## ORDER ON ADMINISTRATIVE APPEALS

ALAN B. JOHNSON, District Judge.

The above captioned matter was heard and argued following submission of written appeal briefs in the above captioned cases. The Court has considered the parties' written submissions, the arguments of counsel during the hearing, the applicable law, and FINDS and ORDERS as follows:

### Background and Contentions

These cases present challenges to the decision of the Bureau of Land Management ("BLM") allowing the development of up to 51,000 coalbed methane wells in the Powder River Basin, which extends from northeast Wyoming into Montana. The project would also authorize construction of 17,000 miles of road and 26,000 miles of pipeline; it would permit up to 1.0 trillion gallons of water to be pumped from

groundwater aquifers onto the surface; allow for excavation of 3,100 unlined reservoirs of waste pits to hold some of the produced water and authorize the discharge of the remainder of the water, untreated, onto the ground. Plaintiffs contend that almost 200,000 acres of surface resources, including soils and vegetation, will be affected.

Mineral and energy-related activities have been significant in the Powder River Basin since the 1960s. Ranching and agricultural production also are among the present uses of land in the Powder River Basin. Many of the federal lands in the basin are split estate lands, where surface is owned privately and mineral estate is owned by the federal government. Five major river systems, three of which (the Powder, Little Powder and Tongue) originate in Wyoming and flow north into the Powder River Basin in Montana. Plaintiffs assert these basins will receive discharges of hundreds of billions of coalbed methane ("CBM") produced water over the life of the project.

Plaintiffs note that the release of CBM from coal requires removal of the water, or dewatering, which is a process involving removal of large amounts of water. Plaintiffs suggest that this process involves on average 14,000 gallons of water per day per well. FEIS at 2–25; A.R. CD6: 116, Table 2–8).[1] The proposed project in the Powder River Basin involves drilling 39,-367 new wells over the next 10 years; as a result more than 3 million acre-feet of

water are expected to be pumped from the ground. The BLM has acknowledged "water is the number one issue in the EIS." A.R. at CD8:622–623 (August 2001 BLM Briefing for Secretary).

There are subsurface water concerns. Groundwater provides water for domestic purposes and ranching and agricultural operations in the area. CBM can impact groundwater, including complete loss of water wells for domestic use and for irrigation. While many underground aquifers will likely be recharged or replenished through infiltration over time, substantial recharge may take more than 100 years.

CBM-produced water is high in salinity and sodicity (ratio of sodium to magnesium and calcium) ("SAR" or "sodium absorption ratio"). See e.g., A.R. CD8: 614, Attachment to October letter from Montana DEQ to Wyoming DEQ. This type of water can negatively affect soils and plant life and may often be unsuitable for irrigation or surface disposal. Disposal is a key issue. A.R. at CD8:622–623 (August 2001 Briefing for Secretary). BLM proposed to dispose of water by (1) putting it in infiltration pits, impoundments or reservoirs or (2) directly discharging onto the ground or into ephemeral and intermittent drainages. Water in pits that does not evaporate will soak back gradually into underground aquifers or spill out onto the ground or streams. CBM water through direct discharge onto the ground may be sprayed onto the ground or dumped into ephemeral drainages. This water is typi-

---

1. Some references are to the hard documents included in the record, such as the FEIS and ROD. These documents are also included in the digitized administrative record, which is occasionally cited as A.R. CDXX:(Bates number). The record includes 20 CD-ROMs with information, generally described as:

ADMINISTRATIVE RECORD

CD1: Background, Preplanning and Guidance Documents
(includes index to administrative record)

CD2: DEIS
CD3–4: Comments on DEIS
CD5: Post DEIS/Pre FEIS Documents
CD6: PRB O & G FEIS and ROD
CD7: Emails
CD8: Washington Office Documents
CD9: Reference Documents
CD10–14: DEIS Groundwater Modeling Files
CD15–16: FEIS Air Quality Modeling Files
CD17–20: GIS Files

cally not treated for salinity or sodicity before discharge. In addition, the movement of water on the surface may cause erosion. *Id.*

Plaintiffs assert disposal of CBM water high in salinity and sodicity threatens soils and vegetation and the future of agriculture in the region. Saline water may irreversibly affect or kill native vegetation which provides forage; salt and water tolerant plants that replace native plants are unpalatable and less productive for livestock. High SAR in CBM water can destroy soil structure by reducing infiltration rates and soil permeability. Crusting or sealing of soils can result, which can increase runoff. Pits constructed by CBM producers will concentrate salts and other contaminants in the six acre ponds, and some water from the pits may discharge into ephemeral channels or alluvial aquifers. Later, they may dry and become salty, barren patches subject to erosion and which can also further spread salt.

Air quality impacts with CBM are also alleged to be significant, including air pollution from general particulate matter, nitrogen oxides from sources including construction of well pads, roads, pipelines, infiltration pits; dewatering coal seams with pumps electrified by gas or diesel fired generators; and use of gas or diesel compressors to transport gas from the surface. See e.g., A.R. at CD7:680–771 (analysis, comments and reports addressing air quality issues). Plaintiffs contend all are sources of air pollution impacting health of residents and causing visibility problems in wilderness areas and national parks.

Plaintiffs complain that the NEPA process has been insufficient in this case. They assert that the process was completed under political pressure to complete the project speedily and hasten development in accordance with the administration's national energy plan. The BLM decided critically important questions, such as whether to prepare a single EIS for the entire basin or two, and whether to include alternatives or a supplemental EIS, on the basis of whether delay would be caused.

Plaintiffs participated in the scoping process, then arguing that a single EIS on CBM development in the entire basin should be prepared, rather than two (one for Montana; one for Wyoming). Plaintiffs requested BLM to analyze a full range of alternatives to the proposed action, including different methods of handling CBM-produced water, such as reinjection and/or desalinization of water, different measures to reduce impacts to landowners, and an analysis of all the impacts on water supplies both in Wyoming and Montana.

After participating in the process and attempting from the time of the Draft EIS ("DEIS") to the Final EIS ("FEIS") to reach a compromise, the BLM announced the Wyoming FEIS January 17, 2003. Plaintiffs assert the FEIS referenced new technical reports regarding surface water impacts, groundwater modeling and air impacts for the entire Powder River Basin, which had not been provided with or included in the DEIS. New information as to water was provided, including a 230 page surface water quality analysis technical report, with new and key assumptions about the two primary water handing options and how much water would enter the surface waters and amount that would recharge depleted aquifers.

With all this information, plaintiffs complain that the agency did not make substantial changes in the proposed action or the alternatives considered. Plaintiffs assert that the FEIS still proposed development of the same exact number of CBM wells the companies wanted, with the same water handling methods, infrastructure and mitigation measures analyzed by the DEIS. The agency determined that no

supplemental EIS was required. A.R. at CD6:3736–3765. Extensive comments were obtained after the Wyoming DEIS was circulated; public hearings were held after the draft EIS. See FEIS Vol. 1 at 2–2; A.R. at CD5:78. A preliminary final EIS was also circulated by the BLM for review and comment to cooperating agencies. A.R. at CD7:32222.

Plaintiffs contend the FEIS failed to take a "hard look" at many key issues and impacts and that it understated impacts to air, water, soils and vegetation, and failed to consider the impacts of the full scope of the project.

February 11, 2003, plaintiffs wrote Director Clarke regarding the new information, arguing that it warranted a supplemental EIS to provide an adequate opportunity for the public to respond. BLM did not respond to plaintiffs.

February 18, 2003, plaintiffs submitted protests on the FEIS.

April 30, 2003, BLM approved development in both Wyoming and Montana, authorizing a total of 82,000 wells for the entire Powder River Basin. The plaintiffs contend the Wyoming Record of Decision ("ROD") did not correct deficiencies in the FEIS nor did it address issues raised in the protests. This litigation was commenced initially in Montana May 1, 2003. On January 13, 2004, the United States District Court for the District of Montana entered its order transferring to Wyoming the case docketed in Montana as CV 03–71–BLG–RWA, entitled *American Lands Alliance, Biodiversity Conservation and George Wuerthner, Plaintiffs v. United States Bureau of Land Management, et al.*, now docketed at Case No. 04–CV–19J following transfer to Wyoming. The Montana Court entered a separate order January 13, 2004 transferring case 03–70–BLG–RWA from Montana to Wyoming. That case is now docketed as Case No. 04–CV–18J in Wyoming. The portions of transferred cases challenge the sufficiency of the Wyoming EIS and ROD in Wyoming regarding coalbed methane development in the Powder River Basin.

Plaintiffs' arguments assert that the standard of review under Section 706 of the Administrative Procedures Act is deferential: whether the decision was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. They contend, however, that such review, while giving deference to the agency, is to be both "probing" and "in-depth" (citing *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir.1994)). They seek to have this Court examine the plaintiffs' claims to determine whether BLM considered relevant data and articulated a rational connection between the facts found and the decision made. *Colorado Environmental Coalition v. Dombeck*, ("CEC"), 185 F.3d 1162, 1167 (10th Cir. 1999).

■ The National Environmental Policy Act, ("NEPA"), 42 U.S.C. §§ 4321 et seq., is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1. The intent is to focus the agency's attention on the environmental consequences of a proposed project, to guarantee that the relevant information will be made available to the larger audience that may also play a role in forming and implementing the agency's decision, and to provide other governmental bodies that may be affected with adequate notice of the expected consequences and the opportunity to plan and implement corrective measures in a timely manner. *Davis v. Mineta*, 302 F.3d 1104, 1114 n. 5 (10th Cir.2002).

■ NEPA requires that federal agencies prepare an environmental impact statement ("EIS") before undertaking major federal action significantly affecting the quality of the human environment. 42 U.S.C. § 4332(2)(C). In the EIS, agencies

must take a hard look at potential environmental impacts of proposed actions and disseminate the conclusions of the analysis to the public. It must ensure informed decision-making to the end that the agency will not act on incomplete information, only to regret its decision after it is too late to correct. *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1216 (9th Cir.1998).

**Case No. 04–CV–18J:**

Plaintiffs argue the BLM failed to take a hard look at the most significant impacts of CBM development:

- Ground water impacts; failed to consider impacts to groundwater, subsequent effects on ranchers and their livelihood; whether water well agreements it proposed as mitigation would protect the interests of the basin's residents and its environment.
- CBM development will produce drawdown in aquifers; with varying levels for various formations. Plaintiffs argue the BLM did not have baseline information which would permit analysis of how many or which wells might have to be abandoned or how those water sources would be replaced, as well as the quality of replacement wells which may require treatment of water.
- BLM failed to take a hard look at surface water impacts; the final analysis and preferred alternative relying on infiltration pits were premised on flawed assumptions, and therefore the FEIS understates the likely impacts to surface water resources.
- BLM's analysis underestimates the quantity of produced water by watershed.
- BLM's analysis does not accurately predict the amount of CBM water that will reach surface waters.
- BLM's analysis does not consider impacts to surface water from contaminants other than SAR and salinity, including heavy metals such as barium, aluminum, lead, chromium, copper, arsenic, manganese, iron, selenium, sulfate and zinc which are toxic to fish and other aquatic life.
- BLM's analysis fails entirely to consider water quality impacts in ephemeral and intermittent streams, despite BLM efforts to meet Clean Water Act requirements for the basin rivers. BLM's model assumes that as long as surface water quality is not degraded in the mainstem, ephemeral drainages can be used as disposal sites for CBM discharge water without regard to quality of water in those drainages. This fails to consider values associated with small streams and impacts of water on these values (e.g., loss of ability to irrigate with good water or water which won't cause irreparable damage to soils).
- BLM's analysis failed to take a hard look at impacts to soil and vegetation.
- BLM underestimated acreage that will be destroyed (underestimated number of infiltration ponds required to handle CBM produced water and understated impacts to soils and vegetation from construction of the ponds).
- BLM never considered impacts of massive accumulation of salt in the environment.
- BLM never considered impacts to structure and function of ephemeral drainages.
- BLM's analysis failed to give a hard look at the impacts to air quality. (The plaintiffs' brief lists at length numerous specific failures in this regard at 32–39.)

- BLM failed to take hard look at the cumulative effects of the project.
- BLM's failure to analyze impacts for the entire life of the project impermissibly narrowed the scope of its analysis and understated the project's impacts.
- BLM's failure to consider impacts of CBM development in both Montana and Wyoming understated the cumulative effects of this project.

Plaintiffs argue that BLM failed to comply with NEPA procedures that ensure a hard look at environmental impacts. Its substantive analysis of the environmental impacts of the proposed development was flawed, in part because it failed to comply with NEPA procedures designed to ensure such a complete and thorough environmental analysis. These procedures require that the process be objective, that it consider a reasonable range of alternatives, and that it provide meaningful opportunity for public involvement and feedback. In this regard plaintiffs also argue:

- The companies' choice of Greystone to prepare the EIS created a conflict of interest and BLM violated NEPA by allowing the companies to select and hire Greystone to prepare the EIS.
- BLM failed to consider a reasonable range of alternatives. The Tenth Circuit applied a rule of reason analysis to determine whether the range of alternatives BLM considered, and the extent to which it discussed them, was adequate. *Utahns for Better Transp. v. United States DOT*, 305 F.3d 1152, 1166 (10th Cir.2002). Alternatives that fall between the obvious extremes of the proposed action and the no-action alternative must be given legitimate consideration.
- BLM failed to analyze different levels of development.
- BLM failed to analyze staged development.

- BLM failed to consider *any* alternative addressing groundwater impacts.
- BLM failed to consider a reasonable range of alternatives for Produced Water Handling (such as reinjection and treatment for beneficial uses).
- BLM failed to prepare a supplemental or revised draft EIS.
- The air quality and surface water quality analyses in the DEIS were inadequate.
- Substantial new information was presented on the FEIS that was not available for prior review and not made available to the public for comment.

**Responses in opposition:**

The respondents in this matter, including Lessees, the BLM and the State of Wyoming, do not substantially differ in their basic points, which are summarized only very briefly here. The respondents argue, as to each point raised by the plaintiffs, that the BLM did take a hard look as required by NEPA and that plaintiffs are essentially seeking to have this Court compel a particular result or outcome. The BLM's analysis was not as limited as plaintiffs' submissions suggest and was based on reasonable assumptions, modeling and data with respect to the proposed project. BLM properly took a hard look at groundwater effects, surface water effects, soils and vegetation effects, air effects, as well as cumulative effects. It also properly selected Greystone as its contractor in accordance with accepted NEPA practices. BLM considered a reasonable range of alternatives and is not required to consider all alternatives. Defendants assert the BLM was not required to prepare a supplemental EIS, and that it rationally concluded that the proposed action did not materially change with that information; the FEIS contained only limited new information and plaintiffs identified no substan-

tial changes or significant new information or circumstances which would require a supplemental EIS.

**Case No. 04–CV–19J:**

In Case No. 04–CV–19J, plaintiffs also bring claims for NEPA and APA violations. In this action, the plaintiffs assert that the Wyoming EIS is inadequate and violates NEPA, and the BLM has failed to prevent unnecessary and undue degradation to sage grouse, prairie dogs, and their habitat.

Although tailored to address sage grouse/prairie dog and habitat issues specifically, the arguments advanced in this companion case are similar to those asserted in Case No. 04–CV–18J and require similar analysis of controlling environmental law. Plaintiffs have argued that the BLM failed to ensure the prevention of unnecessary or undue degradation to sage grouse and prairie dogs, irreversibly and irretrievably condemned the Powder River Basin to CBM development before complying with NEPA and FLPMA, and that it failed to consider a reasonable range of alternatives. The BLM failed to take a hard look at the impacts of CBM development on sage grouse and prairie dogs in that the EIS failed to provide sufficient baseline data, the BLM failed to sufficiently analyze and disclose direct and indirect impacts, and the EIS failed to sufficiently analyze cumulative impacts. The BLM is also alleged to have failed to adequately analyze and support the efficacy of the proposed mitigation measures. The ROD and EIS are fatally flawed, in plaintiffs' view, because (1) the BLM, in allowing CBM development, failed to prevent unnecessary or undue degradation to many resources on the public lands, including sage grouse and prairie dogs, special status species being considered for listing under the Endangered Species Act; (2) the ROD and EIS are *"a fait accompli"* and have made an irreversible and irretrievable commitment of resources prior to completing the NEPA process; (3) the ROD and EIS are deficient in terms of disclosing, analyzing, and mitigating the environmental consequences that they intended to confront, and necessary factors concerning the effect of CBM development on sage grouse and prairie dogs were ignored and the EIS did not constitute the necessary "hard look" required by NEPA; (4) in an attempt to cure these deficiencies, the BLM proposed a "shell game" by purporting to rely on mitigating and site-specific decision-making. Plaintiffs assert that by deferring NEPA analysis that the agency was required to do at the programmatic level into the indefinite future, the BLM effectively admitted that the EIS, as written, was deficient. By deferring the NEPA analysis to numerous site-specific CBM projects, the BLM may never be able to grasp the true extent of degradation to sage grouse and prairie dogs and related landscape scale processes until it is too late to reverse course, contrary to the intent of FLPMA and NEPA. The responses in opposition are consistent with those discussed above in conjunction with 04–CV–18J, and will not be set out at length again herein.

Briefly, the federal defendant disagrees with plaintiffs' assertions and argues the plaintiffs wrongly claim the BLM improperly limited its analysis of impacts considered over the life of the project. The BLM particularly focused on cumulative impacts to sage grouse over time, recognizing that surface coal mining, sagebrush treatments and livestock grazing had reduced availability of sagebrush habitat in the project area. BLM asserts it did consider cumulative effects from previous development including coal mines, power plants, grazing, and other oil and gas projects, as reflected in the voluminous record. It considered and compared direct, indirect and cumulative impacts on wildlife

habitat, including prairie dogs and sage grouse. BLM notes that NEPA is a procedural statute and simply requires the agency to inform itself and the public about the effects of the proposal, which it did. Furthermore, BLM argues it has adopted extensive programs to monitor CBM development and provide for mitigation of potential impacts, as reflected more fully in the FEIS and ROD.

Producers Williams Production and Bill Barrett Corporation respond to the plaintiffs' lease challenge, arguing that the validity of the leasing decisions is not at issue in this case nor properly before the Court. To the extent the plaintiffs' arguments can be so viewed, they should be denied and limited to consideration of their challenges to the FEIS and the ROD in this case. Lessees also assert that plaintiffs' claims under FLPMA are not ripe, and reassert the arguments asserted by them in the companion case regarding the FEIS and ROD. The plan of development was properly considered, made available for public comment and the BLM considered reasonable alternatives in compliance with NEPA, and took a hard look at the impacts of CBM development in the Powder River Basin. The baseline data available to the BLM was sufficient to develop the EIS and permit proper consideration of impacts in the Powder River Basin, including impacts to sage grouse and black-tailed prairie dogs.

The State of Wyoming likewise argues the BLM properly considered the issues raised by the plaintiffs and that the programmatic decision is one in which the State has a continuing and substantial interest in implementation, regulation and monitoring. The lease of lands by the BLM for CBM development is not an irretrievable commitment of resources and no development may proceed until the State of Wyoming issues water management permit(s). It also notes that the Wyoming Department of Game and Fish is responsible for managing the sage grouse and black-tailed prairie dog populations. The monitoring and mitigation measures are reasonable and are based on a hard look at the available data. The State urges that the process used to establish the measures provided for in the ROD with respect to management of the project, including wildlife and environmental impacts, receive judicial approval under NEPA to aid in assisting conservation and maintenance of the State's natural resources.

The Court notes also that since the filing of this case and oral argument in this matter, numerous and voluminous supplemental submissions have been made by all of the parties seeking to introduce and include in this administrative record many decisions and matters that have arisen and/or have been decided by other courts pertaining to similar issues. It should come as no surprise to any of the parties that the Court has reviewed pertinent and recent case law, in the course of studying and reviewing the parties' submissions, and in its effort to educate itself and discern the state of the law. However, the Court does not find it appropriate to include those supplemental submissions as part of the administrative record on appeal, as doing so is contrary to the applicable law in this circuit. The Court's function in a review of agency action is to determine whether the agency's decision was arbitrary and capricious, based on the evidence presented at the hearing and the administrative record that is before the Court in this case. All pending motions to supplement the record on that basis will be, and hereby are DENIED.

**REVIEW OF AGENCY ACTION
STANDARD OF REVIEW**

Under the Administrative Procedures Act ("APA"), judicial review is limit-

ed to the administrative record that was before the agency at the time it made its decision. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). None of the parties seriously dispute the applicable standard of review.

■ The APA provides that the reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...." 5 U.S.C. § 706(2)(A). *See also Utah Environmental Congress v. Bosworth,* 372 F.3d 1219, 1223 n. 7 (10th Cir.2004). This standard requires that the agency provide a reasoned basis for its decision and that the decision be supported by the facts in the record. *Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560, 1575 (10th Cir.1994).

■ The duty of a court reviewing agency action under the arbitrary or capricious standard is to ascertain whether the agency "examined the relevant data and articulated a rational connection between the facts found and the decision made." *Id.* at 1574. The reviewing court "must determine whether the agency considered all relevant factors and whether there has been a clear error of judgment." *Id.* Because the arbitrary and capricious standard focuses on the rationality of an agency's decision-making process rather than on the rationality of the actual decision, an agency's action must be upheld, if at all, on the basis articulated by the agency itself. *Id.* The action may not be upheld on a different basis articulated by the government on appeal to this Court. *Black Butte Coal Co. v. United States,* 38 F.Supp.2d 963, 969 (D.Wyo.1999) (Brimmer, J.).

■ Even if the Court does not agree with the agency's findings, those findings cannot be set aside if they are supported by substantial evidence. *Four B Corp. v. NLRB,* 163 F.3d 1177, 1182 (10th Cir. 1998). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks and citation omitted).

■ An agency's decision will be deemed arbitrary and capricious if the agency relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Lamb v. Thompson,* 265 F.3d 1038, 1046 (10th Cir.2001).

More recently, in *Utah Shared Access Alliance v. Carpenter,* 463 F.3d 1125, 1134 (10th Cir.2006), the appellate court reiterated these notions:

Because none of the statutory or regulatory provisions in question provide for a private cause of action, the judicial review provisions of the APA govern this suit. See 5 U.S.C. § 702; *Colo. Envtl. Coal. v. Wenker,* 353 F.3d 1221, 1234–35 (10th Cir.2004). Under the APA, a reviewing court may set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Silverton Snowmobile Club v. U.S. Forest Serv.,* 433 F.3d 772, 779– 80 (10th Cir.2006). "[T]he essential function of judicial review [of agency action] is a determination of (1) whether the agency acted within the scope of its authority, (2) whether the agency complied with prescribed procedures, and (3) whether the action is otherwise arbitrary, capricious or an abuse of discretion." *Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560, 1574 (10th Cir. 1994)....

To determine whether the agency complied with prescribed procedures, we must review the administrative record and applicable law. *Id.* To determine whether the agency's decision was arbitrary or capricious, we must "ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." *Id.* (footnote omitted). This standard also means that there must be a reasoned basis for the agency's action, and it must be supported by "substantial evidence." *Id.* "Evidence is substantial in the APA sense if it is enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion to be drawn is one of fact." *Id.* (internal quotation marks omitted). Finally, action will be deemed "arbitrary or capricious" if the explanation for the action "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

See also *Silverton Snowmobile Club v. U.S. Forest Service*, 433 F.3d 772, 779–780 (10th Cir.2006):

We review the agencies' compliance with NEPA, NFMA and FLPMA pursuant to the APA, which "'empowers a reviewing court to hold unlawful and set aside [final] agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1268 (10th Cir.2004) (quoting *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1164 (10th Cir.2002), *modified on reh'g*, 319 F.3d 1207 (10th Cir.2003)). In reviewing the agencies' action, "we apply the same deferential standard to the administrative record as did the district court." *Id.* We may set aside agency action "only for substantial procedural or substantive reasons." *Id.* (further citation omitted).

## Discussion

Summarized briefly, insofar as that is possible in this complex administrative case, the substantive challenges involved in these cases consist of objections to the FEIS and ROD with respect to water and air quality and environmental impact issues that might be anticipated and apparent as a result of CBM development in the Powder River Basin, also including those that address the impacts on the prairie dogs and sage grouse and their habitats in this project area. The substantive challenges are programmatic in nature and suggest that the BLM's decision to require subsequent site-specific analysis is not appropriate or adequate. The plaintiffs' arguments cover the entire gamut of challenges to agency action and enumerate numerous agency failures concerning coalbed methane development in the Powder River Basin and the Record of Decision that has served to guide action in this area since that time.

The plaintiffs assert that the agency failed to consider adequately groundwater impacts, aquifer draw down and impacts, surface water impacts, incorrectly estimated the quantity of produced water by watershed, did not consider contaminants, water quality in ephemeral and intermittent streams; the impacts upon soil and vegetation, the amount of actual acreage destroyed and impacted by the project(s); the effects of salt; air quality issues; the cumulative effects of the projects in Wyoming and Montana. They contend there has been a failure to consider a reasonable range of alternatives, in that the agency failed to consider different levels of development, staged development, among other failures, and did not prepare a supplemental or revised DEIS. The air and surface

water quality analyses in the DEIS were not adequate, and when the FEIS was issued, it included information that had not been made available for public review and comment.[2] All of the decisions constitute an irretrievable commitment of resources designed to further one predetermined goal, and the agency failed to consider a reasonable range of alternatives. As noted earlier, the choice of Greystone to prepare the EIS has also been challenged as inappropriate.[3]

The Court disagrees with plaintiffs' arguments and finds them not to be persuasive. The voluminous materials in the administrative record belie the plaintiffs' contentions. The PRB O & G Record of Decision states, in introductory text and excerpted at length here (pages 28–45 below), as follows:

## The Powder River Basin Oil and Gas Project

The Powder River Basin Oil and Gas Project is a proposal of a group of oil and gas companies with leases in the Powder River Basin (PRB). They include Lance Oil and Gas (Western Gas Company), Barrett Resources Corporation (Williams), Devon Energy Corporation, Yates Petroleum Corporation, Pennaco Energy (Marathon Oil Corporation), and CMS Oil and Gas (Perenco S.A.). The companies are collectively identified as the Powder River Basin Companies (Companies).

Upon receipt of the proposal the Bureau of Land Management (BLM) prepared a Reasonable Foreseeable Development (RFD) scenario for the planning area. BLM then initiated the Environmental

2. As noted earlier, the facts in the record do not comport with plaintiffs' arguments. The additional information plaintiffs rely on to bolster their position was made available to the public, was commented upon and was the subject of public hearings. FEIS Vol. 1 at 2–2; A.R. at CD5:78. The preliminary final EIS was circulated for review to sister agencies in November and December 2002. A.R. at CD7:32222. Information was not withheld from the draft EIS; revisions to it were based upon comments and included analysis eventually encompassed in the FEIS, which is precisely the point of the NEPA process. The agency has an obligation to re-circulate if a proposed action ultimately differs so dramatically from the alternatives canvassed in the draft EIS as to preclude meaningful consideration by the public. *California v. Block*, 690 F.2d 753, 770 (9th Cir.1982) (citing 40 C.F.R. § 1500.7(a)), which provides: "It is important that draft environmental statements be prepared and circulated for comment and furnished to the Council as early as possible in the agency review process in order to permit agency decision makers and outside reviewers to give meaningful consideration to the environmental issues involved. In particular, agencies should keep in mind that such statements are to serve as the means of assessing the environmental impact of proposed agency actions, rather than as a justification for deci-

sions already made. This means that draft statements on administrative actions should be prepared and circulated for comment prior to the first significant point of decision in the agency review process."

3. While not addressed at length in the following provisions of this opinion, the Court finds that the selection of Greystone to prepare the EIS was appropriate in this case and that the plaintiffs have not made a showing that the decision was made improperly. The agency's regulations provide an EIS shall be prepared by the agency or a "contractor selected by the lead agency." 40 C.F.R. § 1506.5(c). BLM selected the contractor following the provisions of the BLM Manual for third party contracting and maintained control of the entire process. The oil and gas companies did not select Greystone, although they did recommend the contractor and pay the bill. CEQ guidance provides that "a third party contract refers to the preparation of EISs by contractors paid by the applicant." CEQ Forty Questions, Question 16. See also BLM Manual, A.R. at CD1: 2258–2261. The Court is not persuaded by plaintiffs' arguments challenging the choice of Greystone as contractor; no conflict of interest has been shown that would support plaintiffs' contentions. Any relief plaintiffs seek on that basis will be denied.

Impact Statement (EIS) and Proposed Plan Amendments for the Powder River Basin Oil and Gas Project.

The Final EIS (FEIS) analyzes exploration and development of oil and natural gas, including coal bed methane (CBM), in the PRB and the anticipated impacts and environmental consequences associated with exploration and development of oil and natural gas, including CBM. The FEIS updates the scope and analysis of effects for oil and gas development originally presented in the 1985 Buffalo and Platte River RMPs to include CBM and includes mitigation measures that when applied would reduce the impacts of oil and gas development activities. **Prior to approval of individual Applications for Permit to Drill (APD) or Plans of Development (POD), site-specific environmental analyses will be conducted and will be tiered to the FEIS.**

This document records the decision made by the BLM concerning the proposed plan amendments for managing oil and gas operations on BLM administered public lands and federal mineral estate in the Wyoming portion of the PRB as analyzed in the FEIS.

The planning area encompasses almost 8 million acres of federal, state, and private lands (Figure 1) in all or parts of Campbell, Converse, Johnson, and Sheridan counties. Of the total surface area, BLM administers 883,061 acres (11 percent of the Project Area) and the USDA Forest Service (FS) administers 261,009 acres (3 percent of the Project Area). In addition, BLM administers the federal minerals under 4,326,704 acres (68 percent of the Project Area). Thus, about 3,182,634 acres in the planning area (40 percent) are split estate (private surface and federal minerals). The FS and the State of Wyoming are cooperating agencies in this analysis. The FS will be issuing a separate Record of

Decision (ROD) for FS administered lands.

**Summary of Proposed Action and Alternatives**

Three alternatives were analyzed in detail: (1) Proposed Action, (2) Proposed Action with Reduced Emission Levels and Expanded Produced Water Handling Scenarios, and (3) No Action.

**Alternative 1**—The Companies' proposed action was combined with BLM's Reasonably Foreseeable Development (RFD) scenario. The RFD scenario is based primarily on geology (potential for oil and gas resources to occur) and past and present oil and gas development, with consideration of other significant factors such as economics, technology, and physical limitations on access, existing or anticipated infrastructure, and transportation.

Along with industry's proposed action, which relates only to CBM, BLM's RFD scenario forecasts the continued drilling of an estimated 3,200 oil wells. The RFD scenario also forecasts an estimated 51,000 CBM wells in the EIS area over the next 10 years. About 25 trillion cubic feet (tcf) of CBM may be recoverable from coal beds in the PRB within Wyoming.

The Companies' projections of CBM well drilling and production include various ancillary facilities. The ancillary facilities include access roads, pipelines to gather gas and produced water, electrical utilities, facilities to treat and compress gas and dispose of produced water, and pipelines to deliver gas under high pressure to transmission pipelines. Although the Companies would develop new wells throughout the 10–year period beginning in 2003, most drilling would occur during the first 8 years. Not all 51,000 wells would be drilled into a single coal seam. Wells drilled into differ-

ent coal seams can be collocated on common well pads. The projected number of well pads is 35,589. The total numbers of wells and well pads is based on an 80–acre spacing pattern (eight pads per square mile). The 51,000 proposed CBM wells include an estimated 12,000 existing wells.

Under the Proposed Action, the Companies would construct, operate, and maintain wells and ancillary facilities in 10 of the 18 sub-watersheds that make up the Project Area. However, most of the new wells (63 percent) and facilities would be constructed in two sub-watersheds: the Upper Powder River and Upper Belle Fourche River. Sub-watersheds that would contain relatively high numbers of wells and facilities include Clear Creek, Crazy Woman Creek, Tongue River, and Little Powder River.

Overall, implementation of the Proposed Action could disturb as many as 212,000 acres, though requirements for reclamation will be imposed. This short-term disturbance would encompass about 3 percent of the Project Area, and most would be associated with construction of pipelines and roads. Longterm disturbance is projected to involve approximately 109,000 acres. Compressor stations would account for the smallest amount of the overall disturbance.

Construction of wells under the PRB EIS would begin during 2003. Generally, construction of most CBM wells would be completed over the first 8 years (by the end of 2011). The production lifetime of the wells is expected to be about 7 years, and final reclamation is expected to be completed during the 2 to 3 years after production ends.

Emphasis for water handling for Alternative 1 is untreated surface discharge. All compression would be powered by CBM.

**Alternative 2**—proposes the same number of CBM and conventional wells as the Proposed Action. However, two additional water-handling methods are analyzed: A—emphasis on infiltration, and B—emphasis on treatment for beneficial use.

There are also two air quality options: A—50 percent of booster compression would be electrically powered, and B—100 percent of booster compression would be electrically powered.

Alternative 2A and applicable portions of Alternative 1, relative to use of natural gas fired compressors, was the preferred alternative analyzed in the FEIS.

**Alternative 3—No Action.** This alternative would consist of no new federal wells. Wells would be developed only on state and private mineral ownership. Alternative 3 was determined to be the environmentally preferred alternative because there would not be any oil and gas development on BLM administered public lands and federal mineral estate. The Department of Interior's authority to implement a "No Action" alternative that precludes development by denying the process is, however, limited. An oil and gas lease grants the lessee the "right and privilege to drill for, mine, extract, remove, and dispose of all oil and gas deposits" in the lease lands, "subject to the terms and conditions incorporated in the lease" (Form 3110–2).

Implementation of Alternative 3 would not:

- meet the Purpose and Need,
- accomplish the objectives of the National Energy Policy,
- prevent the financial loss of CBM through drainage, or
- provide an efficient option to recover the resource.

Through the analysis process the following alternatives were eliminated from detailed consideration. The reasons for

dropping these alternatives can be found in chapter 2 of the FEIS.

- Return all produced water to aquifers.
- Capture and treat produced water for additional beneficial uses.
- Staged rate or phased development.
- No action on all lands.
- Discharge produced water to the surface, but ensure that water quality at the Wyoming–Montana border does not change enough to adversely affect the uses of water at and downstream of the border.
- Several environmental groups developed an alternative they identify as the "Conserving Wyoming's Heritage Alternative." This alternative is based primarily on phased development, alternative and innovative technologies, adaptive management, the "reopening" of permits, landowner protections, injection and treatment of produced water, and minimizing adverse effects to the full range of resources present in the Project Area.

**Decision**

Based on the information contained in the FEIS, referenced supporting documentation, and other considerations described below, the decision is hereby made to approve the proposed plan amendments. The decision is to approve Alternative 2A (preferred alternative) for water and that portion of Alternative 1 regarding the use of natural gas fired compressors. Alternative 2A, and that portion of Alternative 1 relative to use of natural gas fired compressors, describes the management goals, objectives, management actions and conditions of use that will guide future management of oil and gas operations on public lands and federal mineral estate managed by BLM within the Buffalo and Platte River Resource Management Plan (RMP) areas.

This plan was prepared under the regulations implementing Federal Land Policy and Management Act (FLPMA) (43 CFR 1600). An EIS was prepared for the plan amendments in compliance with the National Environmental Policy Act (NEPA)

The RMP Amendments approved by this ROD do not change the decisions of the 1985 RMPs relative to the availability of lands for oil and gas development. All other aspects of the 1985 RMPs concerning management of oil and gas and related activities are hereby replaced with the provisions contained in the RMPs as amended. Approval of this amendment provides for the use of the BLM administered public lands and federal mineral estate under the conditions described and the level analyzed in the FEIS.

**This ROD is not the final approval for the action associated with the PRB oil and gas project. BLM or FS must analyze and approve each component of the project that involves disturbance of federal lands on a site-specific basis. A separate authorization(s) from BLM or FS (and other permitting agencies) is required prior to approval of any APD, POD, Sundry Notice (SN), Right-of-way (ROW) Grant or Special–Use Permit before any construction can occur.** (emphasis supplied)

**Goals, Objectives, and Management Actions**

The preferred alternative describes the management goals and objectives and management actions that will guide future management of oil and gas operations on BLM administered minerals within the Buffalo and Platte River RMP areas. The decisions relative to the primary issues are as follows:

**Operator Requirements**

The Companies are responsible for obtaining all necessary federal, state, and county permits, and for implementing the PRB oil and gas project in an environmentally responsible manner (see Appendix A, Table A–1, Federal, State and Local Permits, Approvals, and Authorizing Actions Necessary for Construction, Operation, Maintenance and Abandonment of the PRB Oil and Gas Project).

### Air

As part of the permit approval process, the air quality regulatory agencies will prepare additional analysis, conduct monitoring, and require mitigation as needed to ensure compliance with all applicable standards before permits could be approved.

### Water

As part of the permit approval process, the water quality regulatory agencies will prepare additional analysis, conduct monitoring, and require mitigation as needed to ensure compliance with all applicable standards before permits could be approved.

### Water Well Agreement

All operators on federal minerals are required to offer a Water Well Agreement as set forth in the Gillette South FEIS and the Wyodak FEIS. This agreement protects nearby water wells permitted by Wyoming State Engineer's Office (WSEO). The Companies generally offer the same agreement when they are drilling on fee and state lands (Appendix B)

### Montana and Wyoming Powder River Interim Water Quality Criteria Memorandum of Cooperation

The Interim Memorandum of Cooperation (MOC) documents WDEQ's commitments and intent to protect and maintain water quality conditions in the PRB within Montana.

WDEQ's current permitting process incorporates the numeric water quality standards for electrical conductivity (EC) and sodium adsorption ratio (SAR) adopted for water bodies downstream in South Dakota, specifically drainages in the Upper Cheyenne and Upper Belle Fourche River sub-watersheds. Wyoming and Montana have entered into an interim MOC for waters downstream in Montana to protect the downstream water quality in the Powder and Little Powder River sub-watersheds while allowing for development of CBM in both states. This MOC is included as Appendix C. Interim thresholds are established for EC in the Powder River at the state line, based on monitoring data collected at the gauging station in Moorhead, Montana. The criteria for EC are expressed in monthly maximum values that are not to be exceeded. The two states are also concerned with SAR and bicarbonate, but lacked sufficient data to establish threshold criteria at the time of the MOC. Under the MOC, monitoring of the Little Powder River will include EC, SAR, and total dissolved solids (TDS) to evaluate whether levels of these constituents change appreciably from historical records. In the event that significant changes in baseline conditions are detected, the State of Wyoming would be required to investigate potential causes to determine if CBM discharges are responsible. Wyoming would be required to adjust its criteria for granting permits to ensure compliance with the spirit of the agreement. WDEQ, through its current National Pollutant Discharge Elimination System (NPDES) permitting process, is restricting the amount of CBM discharge water that reaches the main stems to meet the short-term goal of the MOC. Discharges are limited through such mechanisms as impoundment storage, channel loss, and

other consumptive uses. Furthermore, as a matter of policy, WDEQ has elected to impose its antidegradation policy on all CBM discharges. This policy results in effluent limitations in NPDES permits for discharges of CBM produced water that equate to 20 percent of the available increment between low-flow pollutant concentrations and the relevant standards (assimilative capacity) for critical constituents. A separate antidegradation policy for barium, in which the assimilative capacity is basin-specific, is also applied to CBM discharges. Montana has accepted Wyoming's antidegradation policies to be protective of Montana's water quality.

### Water Management Plans

A Water Management Plan (WMP), a comprehensive document that addresses the handling of produced water during the testing and production of CBM well(s) is required to be submitted with CBM APDs or PODs. The WMP must provide adequate information for the BLM to complete site-specific NEPA analysis and to ensure compliance with all state and federal requirements prior to approval. A CBM APD or POD will not be considered complete or processed by BLM unless it contains a WMP. For details on WMPs, see Appendix D.

### T & E

The BLM will comply with the ESA by implementing on BLM administered minerals, when applicable, the measures prescribed in the U.S. Fish and Wildlife Service (USFWS) Biological Opinion (BO) for the FEIS. These measures are included in the Programmatic Mitigation Section in Appendix A of the ROD.

### Sensitive Species

BLM will take necessary actions to meet the policies set forth in sensitive species policy (BLM Manual 6849) for all sensitive species listed in the FEIS, including the greater sage grouse and black-tailed prairie dog. To help ensure BLM's activities do not contribute to the listing of the black-tailed prairie dog or greater sage grouse as threatened or endangered species (see Appendix A for mitigation measures that will be required and Appendix E for monitoring relative to these species). Protection of the prairie dog is provided for in mitigation for the blackfooted ferret, primarily that "prairie dog colonies will be avoided whenever possible."

### Cultural

At a minimum, all areas of proposed ground disturbing activity will be intensively inventoried for cultural resources in conformance with minimal BLM Class III survey standards at the APD, POD, or SN phase of each proposed Federal undertaking. For CBM well fields or PODs, a block survey of the entire project area early in the planning phase is highly recommended by the BLM and is required by the FS. All sites within the planning area must be evaluated for eligibility under the NRHP.

Specific plans for avoidance and protection or minimization of adverse direct or indirect effects would be recommended for any historic properties within the areas of potential effect of proposed project activities. Prior to implementation, these plans must be approved by the BLM or FS, as appropriate, State Historic Preservation Office (SHPO), and, if applicable, by the private surface owner. Such plans might include, but are not limited to the following constraints, stipulations, or actions:

- Relocation, redesign, or constraint of project facilities and infrastructure to avoid or minimize earth disturbance within historic properties or contributing portions of historic properties or to avoid or minimize indirect effects or intrusions caused

by vibration, dust, exhaust, or noise. This may include barricading or fencing of sensitive areas and buffer zones.

- Relocation, redesign, or constraint of project facilities and infrastructure to avoid or minimize visual intrusion on a sensitive historic, traditional, or religious setting. This might include low profile facilities, non-intrusive colors, landscaping, berms, screening with vegetation, or other measures to minimize visual impact.

- Stabilization of sediments, bedrock, or structures that could be destabilized, or could deteriorate, as a result of nearby project activities and identification of an appropriate buffer zone.

- Restriction or prevention of access to sensitive areas.

- Rehabilitation of buildings or structures, or protective screening of art work to minimize deterioration.

- Detailed documentation, possibly including archival photo documentation, of contributing structures, landscape features, or aspects of historic setting that cannot feasibly be avoided. In some cases it may be feasible to restore some of these contributing features after construction has been completed.

- Detailed recordation or data recovery of the essential contributing elements of a historic property that cannot be avoided or protected. Recordation may include archival, documentary, and contextual research related to the historic property in addition to site documentation. Data recovery is the systematic recovery of data important in history or prehistory for which the property is considered eligible. Data recovery for prehistoric or historic archaeological sites typically entails excavation of buried materials and detailed documentation of stratigraphic context.

## Vegetation

An Integrated Pest Management Plan (IPMP) will be required to be submitted with the APD if the location of the well or POD falls within an area of identified noxious weeds. For details on the IPMP see Appendix F.

## Reclamation

Phased reclamation plans will be submitted to the Buffalo Field Office (BFO) and Casper Field Office (CFO) for approval prior to individual CBM POD facility abandonment. These plans will be submitted as a Notice of Intent (NOI) SN for individual facilities, such as well locations, pipelines, discharge points, and impoundments, because they are no longer needed.

## Areas of Critical Environmental Concern

The Sierra Club of Wyoming petitioned the BFO during the scoping process to nominate areas for designation as outlined in the BLM's 1617.8 Manual guidelines for Designation of Areas of Critical Environmental Concern, (ACEC). These designations apply only to public lands.

Before an area is nominated for ACEC designation the area must meet both the relevance and importance criteria (43 CFR 1610.7–2) and BLM Manual 1613, to become eligible for further consideration.

Of the eight areas reviewed, the BLM administered lands on two areas were found to not meet the criteria and were dropped from further consideration. The BLM administered lands on 6 proposed ACECs were found to meet the

criteria and were retained for further consideration (FEIS Appendix R).

The six areas that met the criteria for relevance and importance are being deferred for designation until such time as an amendment specific to their designation or revision of the Buffalo RMP is conducted. Any future land use planning process addressing these areas will provide an opportunity for the public to provide comments on the findings in this evaluation. A decision to not designate part or all of the proposed area as an ACEC does not require the preparation of a plan amendment and is exempt from NEPA.

As determined in the analysis, no interim management was determined to be needed for the six areas in order to maintain the relevance or importance criteria considerations. It was determined that the existing lease stipulations, COA and programmatic mitigation would provide adequate mitigation. However, when APDs are received that encompass these areas, mitigation measures will be reevaluated and/or additional site-specific mitigation would be implemented to ensure protection of values for meeting the relevance and importance criteria.

## Operations on Split Estate Lands

The BLM, under FLPMA, must identify how the federal mineral estate will be managed, including identification of lease stipulations. To meet the consistency requirements of FLPMA, the same standards used for environmental protection of Federal surface are also applied to the federal mineral portion of split estate lands (private surface underlain by federal minerals).

The impacts to surface resources and surface uses from BLM-authorized mineral development must be considered not only on BLM administered public lands but also on split-estate lands.

The BLM also has the authority and responsibility to impose restrictions deriving from applicable law and regulation; implement stipulations developed through the Land Use Planning process; enforce lease terms and provisions of onshore orders and take reasonable measures to avoid or minimize adverse environmental impacts that may result from federally authorized lease activities regardless of surface ownership.

The analysis documented in the FEIS and the decisions made in this ROD are pertinent to all Federal oil and gas lease lands, including split estate, and are subject to all applicable statutes. This includes all of the identified mitigation and Standard COA in the ROD. It is important to understand that BLM only imposes mitigation and COA on the Companies as a result of site-specific environmental analyses of APDs, PODs, and SNs. These measures are not applied to dictate to the surface owner how to manage his or her property, but are only applied to the Company to ensure environmentally sound oil and gas development in conformance with BLM's statutory responsibilities. BLM specialists consult with private landowners on split-estate situations during the APD, OD, and SN review and approval process to ensure their involvement. Private landowner views, in addition to the effect that implementing possible mitigation and COA might have on the use of their surface, are always carefully considered by BLM in the approval of split-estate federal lease actions.

BLM cannot approve APDs, PODs, or subsequent SNs on federal leases until all applicable federal statutory requirements have been met. In some instances, a COA may be applied to meet a statutory requirement.

## Interagency Work Groups

The BLM and WDEQ will work with the Montana Department of Environmental Quality, EPA, National Park Service, FS, and other federal, state, and tribal authorities to establish interagency working group(s) for CBM development in the PRB. The working group(s) will be responsible for guiding and designing the monitoring to validate the accepted mitigation measures and to ensure each agency's actions achieve compliance with applicable air and water quality standards across jurisdictional boundaries. In order to ensure consistency, the interagency work group will also coordinate with other work groups established to address CBM development in Montana.

The interagency working group(s) will, of necessity, depend upon the regulatory and management policies of the WDEQ as the agency with air and water quality primacy. Each agency within the working group(s) will maintain their regulatory authorities throughout the process.

**Management Considerations**

The FEIS fully complies with BLM's multiple use mission while considering and providing for responsible development of important oil and gas resources as described in FLPMA.

The FEIS considers the use and/or protection of the full extent of the resources managed by BLM, including important energy and natural resources available in the planning area. While the plan amendments support the development of oil and gas resources, they also include the application of mitigation measures to minimize or avoid impacts to resources or land uses from oil and gas activities and prevent unnecessary or undue degradation. In addition to the mitigation measures included in the plan amendments, lease stipulations may be applied to protect critical resource values. Other protective measures may be required at the APD stage to mitigate site-specific impacts when not inconsistent with lease rights granted or specific provisions of the lease.

The decision to approve the plan amendments for the Buffalo and Platte River RMPs takes into account statutory, legal, and national policy considerations. The analysis in the DEIS and FEIS was based on evaluation of the planning areas for oil and gas development and the identification of sensitive natural and cultural resources. The FEIS evaluated the effects of surface disturbance on these resources, and identified protective measures for consideration on a case-by-case basis to avoid or reduce impacts on important land uses and other resource values. The constraints placed on oil and gas development were reviewed in light of resource protection and where possible, major conflicts were resolved to provide a balance between protection of sensitive resources and sound practices for development of oil and gas resources. The decision also was based on input provided by and received from the public, industry, as well as other federal and state agencies. Through the review process many practicable methods to reduce environmental harm, without being overly restrictive to oil and gas exploration and development, were incorporated into these plan amendments.

Impacts identified for the preferred alternative are acceptable for the following reasons: 1) as the nation's largest land manager, the Department of the Interior, through the BLM, plays a major role in implementing the National Energy Policy developed by President Bush; 2) the National Energy Policy promotes the production of reliable, affordable and environmentally clean energy; 3) among the Nation's most pressing concerns is to reduce our reliance on foreign oil and gas while protecting the

environment; 4) BLM-administered lands contain world class energy and mineral resources, vital to the National interest; 5) the vast energy and mineral resources under BLM's jurisdiction places the agency in the key role of ensuring that our country has an adequate supply of energy necessary for the safety and security of our families, our communities and our Nation; 6) CBM is available on public lands and BLM has a multiple use mission under FLPMA; 7) the preferred alternative is an environmentally sound alternative; and 8) the approved alternative complies with laws and regulations.

In addition, the decision to allow development as described in the selected alternative facilitates protection of the financial interest of the United States by preventing drainage of federal minerals. Based on the amount of public interest in air and water quality issues the following management considerations were additional factors in the decision.

### Air Quality

For Alternative 1, (natural gas fired compression engines) the analysis documents that the benefits to air quality and visibility from electrifying half or all of the booster compressors is negligible and would be insufficient to justify the additional costs of requiring the Companies to use electric booster compressors. Additionally, construction of new power generation sources to provide electricity to these compressors and associated distribution lines would be required. Also, the Companies would build relatively few booster compressors on surface owned by the federal government and BLM does not have the ability to require electrification of compressors constructed off federal surface. The State of Wyoming is responsible for permitting the compressors. The need for electrical compression as a condition of approval is best developed based on a case by case review of the emissions permit applications to be issued by the WDEQ. Choosing this option does not preclude the WDEQ from requiring the use of electric compression if determined to be necessary during its permitting process. This gives the WDEQ maximum flexibility to permit facilities in the most economical way that complies with applicable national and state air quality standards.

### Water Quality

Although implementation of Alternative 2A for water may disturb more land and cost more than Alternative 1, BLM selected Alternative 2A with the emphasis on infiltration of produced water because Alternative 2A involves separate water management strategies for each sub-watershed that align with Wyoming Department of Environmental Quality's (WDEQ) current approach to permitting; the water management plans required under Alternative 2A would minimize the volume of water that reaches the main-stems in the sub-watersheds of the Little Powder River, Powder River, and Tongue River, reducing the potential for adverse effects on the water quality in the sub-basins most sensitive to potential changes in water quality, and most heavily used by irrigators; Alternative 2A would maximize local beneficial use of the produced water rather than discharging the water downstream where the state and surface owners get no benefit from this resource; Alternative 2A maximizes infiltration and storage of the produced water into the shallow aquifers of Wyoming, rather than having this resource pumped into surface waters that leave the state. This infiltration also would help with deeper aquifer recharge in the PRB; Alternative 2A encourages treatment of produced water, where feasible and practicable.

### Summary

Because the benefits to the nation from development of oil and gas resources in the PRB are substantial, and can be developed through careful planning, coordination and consultation with federal and state agencies and tribes and in an environmentally sensitive manner, amending the RMPs as described above will best balance the need for energy with environmental protection.

PRB O & G Project Record of Decision at pages 1–13 (emphasis supplied). See also PRB O & G FEIS, for additional extensive discussion of all these issues, including biodiversity, conservation issues, habitat fragmentation, threatened and endangered species and ecosystem function, and other materials included in the extensive Administrative Record.

The Court finds that the BLM did consider a reasonable range of alternatives based upon reasonable assumptions, modeling and data with respect to the proposed project.[4] The plaintiffs are obvious-ly dissatisfied with the decision ultimately made by the BLM with respect to the project. Notwithstanding the plaintiffs' desire for some other outcome and their hope to compel a different result with respect to the project, presumably the no action alternative they seem to favor notwithstanding their claims to the contrary, this Court cannot grant the relief they seek.

This Court has discussed NEPA in recent cases, which provides helpful analysis of that Act. In *State of Wyoming v. United States Department of Agriculture*, 570 F.Supp.2d 1309 (D.Wyo.2008), "Order Granting Plaintiff's Motion for Declaratory judgment and Injunctive Relief," entered August 12, 2008, Judge Brimmer stated:

1. NEPA Overview.

 a. NEPA's Statutory Mandate and Structure.

 NEPA requires federal agencies to consider the environmental impacts of

---

4. Plaintiffs' argument that the agency did not consider phased or staged development is not borne out by the record. For example, in the FEIS, at 2–65, in the section entitled "Alternatives Considered But Eliminated from Detailed Analysis" several potential alternatives were considered but eliminated from detailed study for various reasons. Staged rate or Phased development is discussed at 2–68 of the PRB O & G FEIS: "This alternative was developed in response to a variety of issues raised during scoping, including concerns about the volume of water discharged to local drainages. Staged or phased development was presented to BLM during scoping in several ways. First, the number of rigs operating in the Project Area could be controlled and leases would be developed in stages. Second, the Companies would be allowed to develop production in one geographic area at a time and when complete, move on to another area. Lastly, corridors could be left undeveloped to allow for wildlife movement." The reasons offered for dropping this alternative: "The State of Wyoming or private parties own much of the minerals and surface in the Project Area and the BLM and FS have no legal authority to direct the Companies in developing these leases. Additionally, the BLM and FS have a legal obligation to ensure that leased federal minerals are fully developed and that production occurring on non-federal leases does not drain federal minerals. This alternative is not reasonable in the case of existing leases because each lessee has an investment-backed expectation that its APDs will be considered in a timely manner and approved absent unacceptable site-specific impacts (see the Supreme Court decision in *Mobil Oil Exploration and Producing Southeast, Inc. v. United States*, 530 U.S. 604, 620, 120 S.Ct. 2423, 147 L.Ed.2d 528 [2000] which found a breach of contract when the Minerals Management Service, pursuant to a later adopted statute, would not review and make a timely decision on development plans per the regulatory scheme in place at lease issuance.) ... In addition, the Mineral Leasing Act and 43 CFR 3100 require maximum ultimate economic recovery of oil and gas from leased lands. In light of the broad geographic distribution of leases in the PRB, phased development in any fashion would not allow compliance with the above requirements."

their actions, disclose those impacts to the public, and then explain how their actions will address those impacts. *Baltimore Gas & Elec. Co. v. Natural Res. Defense Council,* 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). NEPA prescribes the process, not the end result, of agency action. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). If the agency follows the NEPA process, as set forth in the agency's implementing regulations, the public is ensured that the agency was informed of the environmental consequences of its final action. *Colo. Envtl. Coalition v. Dombeck,* 185 F.3d 1162, 1172 (10th Cir.1999). In this regard, the Tenth Circuit has repeatedly emphasized that NEPA only requires an agency to take a "hard look" at environmental consequences before taking a major federal action that significantly affects the quality of the human environment. *Citizens' Comm. to Save Our Canyons v. U.S. Forest Service,* 297 F.3d 1012, 1022 (10th Cir.2002) [hereinafter *"Save Our Canyons"*].

To ensure that federal agencies take a "hard look" at the environmental consequences of their actions, NEPA requires an agency to prepare an environmental impact statement ("EIS"). *Friends of the Bow v. Thompson,* 124 F.3d 1210, 1213 (10th Cir.1997). "An EIS is a detailed statement of the environmental impact of a proposed action." *Id.* The Tenth Circuit has described the NEPA process an agency follows in preparing an EIS:

> Initially, any agency announces its intent to study a proposed action through a process called scoping, during which the agency solicits comments and input from the public and other state and federal agencies with the goal of identifying specific issues to be addressed and studied. 40

C.F.R. § 1501.7. After assessing the input from the scoping process, the government then prepares a draft Environmental Impact Statement (DEIS), *id.* § 1502.9(a), which is then presented to the public and other government agencies for notice and comment. *Id.* § 1503.1(a). After evaluating the feedback received during the notice and comment process, the agency prepares a [final EIS (FEIS) ]. *Id.* § 1502.9(b). If after preparing either a DEIS or FEIS, the proposed action substantially changes in a way "relevant to environmental concerns," or if new information comes to light about environmental impacts, an agency must prepare a supplemental EIS (SEIS). *Id.* § 1502.9(c)(1).

*Save Our Canyons,* 297 F.3d at 1022.

In the end, the agency must address the following in its EIS: (1) the purpose and need for the proposed action; (2) environmental impacts resulting from the actions; (3) alternatives to the proposed action; (4) the relationship between short-term uses and long-term productivity; and (5) the amount of resources that must be devoted to the proposed action. *Id.*; 42 U.S.C. § 4332(2)(C)(i)-(v); 40 C.F.R. § 1502.10.

### b. Judicial Review of NEPA Compliance.

The role of the judiciary in the NEPA process is twofold. First, the court must ensure that the agency has taken a hard look at the environmental consequences of its actions and has adequately disclosed those impacts to the public. *Baltimore Gas,* 462 U.S. at 97–98, 103 S.Ct. 2246; *Middle Rio Grande Conservancy Dist. v. Norton,* 294 F.3d 1220, 1225 (10th Cir.2002). Second, the court must ensure that the agency's decisions were not arbitrary or capricious. *Balti-*

*more Gas,* 462 U.S. at 97–98, 103 S.Ct. 2246; *Utahns for Better Transp.,* 305 F.3d at 1163.

In reviewing the adequacy of an EIS, a federal court simply examines whether the agency objectively presented all the topics required by NEPA. *Colo Envtl. Coalition,* 185 F.3d at 1172. In so reviewing, the court must make a pragmatic judgment about whether the preparation of the EIS and its ultimate form and content fostered informed public participation and informed decisionmaking. *Id.*

While a federal agency is entitled to a presumption of regularity in arriving at its decision, the court is not simply a "rubber stamp" for agency action and will set aside agency action if it is in contravention of the agency's own rules or congressional mandate. *See Glisson v. U.S. Forest Service,* 876 F.Supp. 1016, 1023–24 (S.D.Ill.1993). In other words, the court will not accept pro forma compliance with NEPA procedures, nor post hoc rationalizations as to why and how the agency complied with NEPA. *See Davis v. Mineta,* 302 F.3d 1104, 1112–13 (10th Cir.2002); *Utahns for Better Transp.,* 305 F.3d at 1165.

*State of Wyoming v. United States Department of Agriculture,* 570 F.Supp.2d at 1330–32, "Order Granting Plaintiff's Motion for Declaratory Judgment and Injunctive Relief," entered August 12, 2008.

The instant case presents different facts and issues than those at issue in the "Roadless Rule" case. Contrary to the plaintiffs' arguments, the instant case is not one in which it appears that there was an arbitrary and capricious decision engineered to reach a particular, pre-determined conclusion as to the choice of alternatives and consideration of cumulative impacts in a "mad rush," which turned the NEPA process on its head. *Id.* at 1344. Here, the FEIS and subsequent ROD

were achieved after extensive NEPA analysis and extensive opportunities for public participation. The BLM's NEPA documents clearly acknowledged that the decisions regarding this NEPA analysis would not be the end of the story with respect to future decisions requiring site-specific analysis. It is readily apparent from a reading of introductory material in Chapter 1 of the FEIS that further analysis would be required as the project progressed. The provision is excerpted at length below:

> A group of oil and gas companies (Lance Oil and Gas [Western Gas Company], Barrett Resources Corporation [Williams], Devon Energy Corporation, Yates Petroleum Corporation, Pennaco Energy [Marathon Oil Corporation], and CMS Oil and Gas [Perenco S.A.] ), collectively identified as the Powder River Basin Companies (Companies), has notified the U.S. Department of Interior, Bureau of Land Management (BLM) and U.S. Department of Agriculture, Forest Service (FS) of their intent to develop additional coal bed methane (CBM) resources in Wyoming's Powder River Basin (PRB). Implementation of this project would continue and expand development of CBM that has been occurring in the PRB over the last few years. In general, the Companies propose to:
>
> ● Drill, complete, operate, and reclaim almost 39,400 new natural gas wells and
>
> ● Construct, operate, and reclaim various ancillary facilities needed to support the new wells, including roads, pipelines for gathering gas and produced water, electrical utilities, and compressors.
>
> The proposed project would occur in a Project Area of almost 8 million acres (Figure 1–1). This Project Area encom-

passes all or parts of Campbell, Converse, Johnson, and Sheridan counties and all or parts of 18 fourth-order watersheds (sub-watersheds). The proposed project would involve both public and privately owned lands. The public lands include areas administered by the BLM, the Medicine Bow National Forest, and the state. Additional information on land ownership and jurisdiction is presented in Chapter 3.

**Development of Oil and Gas on Federal Lands in the Powder River Basin**

Development of oil and gas in the PRB is generally classified into two categories: CBM and non-CBM. Development of CBM resources began in the mid–1980s. With advancements in technology, development and production of CBM has been increasing substantially since the mid–1990s. In contrast, production of non-CBM resources was relatively stable from 1986 through 1991, but has been declining sharply since (BLM 2001f). Overall, oil and gas development in the PRB, exclusive of CBM, is expected to decline slowly (BLM 2001f).

Five sets of documents provide the primary guidance on development of oil and natural gas from federal lands and minerals estates in the Project Area. Two sets of these documents are the resource management plans (BLM 1985b and BLM 2001a), Final Environmental Impact Statements (FEISs), and Records of Decision (RODs) for the Buffalo and Casper Field Offices. The other three sets of documents provide the primary guidance for the Thunder Basin National Grassland (TBNG), which is administered by the Medicine Bow National Forest. These sets are the 1985 Land and Resource Management Plan (LRMP), FEIS, and ROD for the Medicine Bow National Forest and TBNG; the 1994 FEIS and ROD for Oil and Gas Leasing on the TBNG; and the LRMP Revision, FEIS, and ROD. The FS released the ROD on the FEIS and proposed LRMP for the TBNG in July 2002 to replace the 1985 plan, as amended. However, leasing decisions on the area west of the coal outcrop line were deferred pending the cumulative effects analysis for CBM in this National Environmental Policy Act (NEPA) analysis. Thus, the 1985 LRMP, as amended by the 1994 oil and gas leasing decision, is still in effect for oil and gas leasing decisions west of the coal outcrop line. In addition to the five guidance documents, BLM and FS have conducted several specific analyses on development of CBM on federal lands. They include the American Oil and Gas Marquiss Field Coal Bed Methane Project Environmental Assessment (EA) (BLM 1992a), Exxon Pistol Point Coal Bed Methane Project EA (BLM 1992b), Gillette South Coalbed Methane Project Draft Environmental Impact Statement (DEIS) (BLM 1995b) and FEIS (BLM 1997a), Lighthouse Coal Bed Methane Project Environmental Assessment (BLM 1995c), Gillette North Coal Bed Methane Project Environmental Assessment (BLM 1996a), Wyodak CBM DEIS and FEIS (BLM 1999c and 1999d), and Wyodak Drainage CBM EA (BLM 2000b). These reports and their associated decision documents specifically address the development of CBM that has been occurring on federal lands since 1992.

**Purpose of and Need for the Proposed Action**

The Companies hold valid federal, state, and private leases for oil and natural gas in the Project Area. The leases have created contractual and property rights for the Companies from the United States, the State of Wyoming, and private mineral owners to develop oil and natural gas resources. The purpose of

the Companies' proposal is to extract, transport, and sell oil and natural gas at a profit from the portions of the Project Area leased by them.

BLM and FS recognize the extraction of oil and natural gas is essential to meeting the nation's future needs for energy. As a result, private exploration and development of federal oil and gas reserves are integral to the agencies' oil and gas leasing programs under the authority of the Mineral Leasing Act of 1920, as amended by the Federal Land Policy and Management Act (FLPMA) of 1976 and the Federal Onshore Oil and Gas Leasing Reform Act of 1987. The oil and gas leasing program managed by BLM and FS encourages the development of domestic oil and gas reserves and reduction of the U.S. dependence on foreign sources of energy.

As a result of the contractual and property rights created by the valid leases, the direction set forth in BLM's oil and gas leasing program, the status of BLM's two RMPs, and the FS' LRMP, Revised LRMP, and FEIS for Oil and Gas Leasing, BLM and FS need to evaluate the level of development of oil and natural gas in the Project Area over the next 10 years. Specifically, BLM and FS need to evaluate the direct, indirect, and cumulative effects of the Proposed Action and reasonable alternatives and the conformance of this action with the associated RMPs.

When the five sets of primary guidance documents identified above were prepared, the levels of development for oil and natural gas anticipated at the time were less than are currently proposed by the Companies and the agencies' current Reasonably Foreseeable Development (RFD) Scenario (Appendix A). In particular, the current and proposed levels of development of CBM were not specifically analyzed. Consequently, BLM and FS need to determine con-

formance of the Proposed Action and alternatives to that action with the land use plan decisions described in the RMPs for Buffalo and Casper, the LRMP for Medicine Bow National Forest, and the FEIS for Oil and Gas Leasing on TBNG.

Therefore, this FEIS serves five purposes. First, it provides the basis to analyze and disclose the impacts of the level of development proposed in the Project Area (both under the Proposed Action and RFD scenarios). It addresses the effects of implementing a level of development of oil and natural gas within the Project Area that is conceptual in nature. The wells, roads, pipelines, and ancillary facilities depicted in this FEIS represent a proposed level of development and tentative locations for these facilities. The final location for each component would be established through future site-specific analyses that BLM and FS would require for each facility. These analyses would occur when the Companies file applications for each component, such as an Application for Permit to Drill (APD), a FS Special Use Permit (SUP), or a BLM Right–of–Way (ROW) Grant.

Second, this FEIS provides the means for the BLM and FS to provide federal minerals to meet the nation's energy needs. It also facilitates protection of the financial interest of the United States by preventing drainage of federal minerals.

Third, the FEIS identifies mitigation measures to address issues and conditions of approval for the subsequent site-specific applications for individual locations. These measures and conditions would be incorporated into the permitting process for the individual facilities (again through the APD, SUP, or ROW Grant processes).

Fourth, for the FS, the NEPA analysis documented in this FEIS will be used to assess the lease stipulations in the revised (2002) LRMP to determine whether the lease stipulations need to be modified or if new stipulations need to be developed for the 58,460 acres of the TBNG west of the coal outcrop line that have potential for development of CBM. In the July 2002 ROD for the FEIS and LRMP revision for the TBNG, these decisions were deferred pending completion of this FEIS.

Finally, BLM also is using the outcome of the impact analysis to review the existing RMP decisions. This includes decisions concerning the level of resource use and conditions of use. If the decision makers determine that one or both of the agencies will amend one or both land use plans, the analyses contained in this FEIS will provide the basis for the amendments.

**NEPA Process, Including Tiering and Decision Making**

NEPA and directives by the Council on Environmental Quality (CEQ) require BLM and FS to analyze proposed actions that would involve federal lands and leases in terms of their potential effects on the human environment. Furthermore, regulations that implement the Mineral Leasing Act of 1920 require BLM and FS to review and act on APDs and the attached Surface Use Plans of Operations (SUPO) and to decide on the requirements for surface occupancy specified in the SUPO. BLM and FS also issue ROW Grants and SUPs to construct and operate linear transportation facilities, such as roads and pipelines, across federal lands under Title V of FLPMA and under the Mineral Leasing Act.

The analysis of effects to the human environment discloses the potential environmental consequences of proposed actions and alternatives. BLM and FS also are responsible for establishing provisions to ensure that facilities and disturbed lands are reclaimed if an oil and gas operator would fail to complete adequate reclamation efforts. Bonds are required for oil and gas operations on federal leases to indemnify the government for safe rehabilitation, royalty payments, and civil penalties. Bonds also are required for ROWs on federal lands. The BLM, Buffalo Field Office in Buffalo, Wyoming, is the lead federal agency responsible for conducting the NEPA analysis and preparing this FEIS. The FS (Medicine Bow National Forest) is a cooperating agency and is responsible for protecting non-mineral resources on National Forest System (NFS) land in TBNG. The Proposed Action and the alternatives were developed by an oversight team consisting of BLM, FS, State of Wyoming agencies, five conservation districts, and the four counties. Wyoming agencies specifically designated to represent the state as a cooperating agency on this team included the Office of Federal Land Policy, Wyoming Department of Environmental Quality (WDEQ), the Wyoming Oil and Gas Conservation Commission (WOGCC), the Wyoming State Engineer (WSEO), and Wyoming State Geological Survey. The state also designated eight additional agencies to assist these four agencies. This document provides the responsible agencies with information that can be used as the basis for a final decision that considers factors relevant to the proposal. Scoping issues and concerns raised by the public and agencies drove the development of alternatives and focused the environmental impact analysis. This FEIS documents (1) the analysis of effects that could result from implementation of the Proposed Action or alternatives, (2) the development of protection measures necessary to avoid, minimize,

reduce, eliminate, or rectify environmental consequences, and (3) the review of BLM's existing RMP decisions.

The regulations that implement NEPA encourage tiering in an EIS. Tiering is the process of referencing information presented in other NEPA documents that were prepared previously, such as EISs, to minimize repetition. This FEIS is specifically tiered to the five sets of guidance documents identified previously.

Finally, this FEIS is not a decision document; it documents the potential environmental consequences of implementing the proposed oil and gas development project and alternatives. The decisions about the FEIS and proposed plan amendment will be documented in separate RODs (one for the BLM and one for the FS) signed by the agency's responsible official. Decisions by BLM and FS will apply to federal lands and leases administered by BLM and the FS. Decisions by other jurisdictions to issue or deny approvals related to this proposal may be aided by the disclosure of effects available in this analysis.

**Decisions to be Made Based on this NEPA Analysis**

The decision makers for the BLM (Wyoming State Director) and FS (Medicine Bow–Routt National Forests Supervisor) will decide based on the analysis documented in this FEIS whether the proposed action is in conformance with the land use plan decisions, new mitigation measures need to be adopted, or if any of the management plans will be amended. They also will decide whether current RMP or LRMP lease stipulations are adequate or if new stipulations need to be developed.

The FS has released a ROD, Revised LRMP, and FEIS for the TBNG (July 2002). East of the coal outcrop line new leasing decisions are included in the July 2002 ROD. Currently, the area west of the coal outcrop is available for leasing under the 1994 ROD for Oil and Gas Leasing on the TBNG. After the analysis of cumulative effects contained in this FEIS is available, the NEPA analysis documented in this FEIS will be used to assess the lease stipulations in the revised (2002) LRMP to determine whether the lease stipulations need to be modified or if new stipulations need to be developed for the 58,460 acres of the TBNG west of the coal outcrop line that have potential for development of CBM. In the July 2002 ROD for the FEIS and LRMP revision for the TBNG, these decisions were deferred pending completion of this FEIS. The FS will include a decision on whether or not to implement the stipulations identified in the leasing analysis conducted for the 2002 Revised LRMP in the ROD accompanying this FEIS. In addition, the ROD will include a decision on stipulations and forest plan standards and guidelines needed to implement mitigation measures identified in this FEIS.

**Decisions to be Made Following Additional NEPA Analysis**

The RODs associated with this FEIS will not be the final review or the final approvals for the actions associated with the PRB oil and gas project. BLM and FS must analyze and approve each component of the project that involves disturbance of federal lands on a site-specific basis. A separate authorization(s) from BLM (and other permitting agencies) is required prior to approval of any APD, ROW Grant, or SUP before any construction can occur.

The APD includes a surface use program and a drilling plan. The detailed information to be submitted under each program is identified in Onshore Oil and Gas Order No. 1 and 43 CFR Part 3162.3. An on-site inspection of the locations proposed for the well, access road,

pipelines, and other areas of proposed surface use would be conducted before approval. The inspection team would include BLM, FS (if construction would occur on NFS lands), the lessee or its designated representative, and the primary drilling and construction contractors. Where applicable, federal grazing lessees would be invited to participate. For inspections that involve split estate lands (lands with both private surface and federal minerals ownership), BLM also would invite the surface owner to attend the on-site.

The on-site inspection would identify potentially sensitive areas and the environmental consequences associated with the proposal at each location and apply the methods needed to mitigate the effects on a site-specific basis.

The on-site inspection could include site-specific surveys for cultural resources or threatened or endangered species, if the potential for these resources to occur exists on or near the proposed disturbance. After the site inspection, the APD may be revised or site-specific mitigation measures may be added as Conditions of Approval to the APD, consistent with applicable lease terms, to protect surface or subsurface resource values near the proposed activity. These conditions may include adjusting the proposed locations of well sites, roads, and pipelines; identifying the construction methods to be employed; and establishing reclamation standards for the lands.

Since the ROD for the Wyodak FEIS was issued, BLM has required that CBM projects be submitted as Plans of Development (POD). A POD is a group of wells and their supporting infrastructure (such as roads, pipelines, power lines, water discharge points, booster stations, and compressor stations) for a geographic area or sub-watershed. The POD helps the operators develop a logi-cal, economical, environmentally sound CBM project that the BLM can efficiently process and approve.

BLM is responsible for conducting an environmental analysis on BLM lands (BLM surface ownership and all federal ownership of mineral, split estate), preparing the documentation, and specifying mitigation measures to protect surface resources for APD approval. The FS would have similar responsibilities on NFS lands. BLM is responsible for approval of the drilling program, protection of ground water and other subsurface resources, and final approval of the APD on both BLM and NFS lands.

Access roads and pipelines on land managed by BLM outside the applicant's lease would require a ROW Grant. Likewise, facilities on NFS lands would require an SUP. The APD could be acceptable as an application for a ROW Grant or SUP for off-lease facilities if it provides sufficient detail of the entire proposal.

After drilling, routine well operations would not require approval. However, BLM would have authority for approving a variety of related activities. Any changes to an approved APD, certain subsequent well operations, and all subsequent new surface disturbances, such as workover pits, would require prior approval. Complete details of subsequent well operations are set forth in 43 CFR 3162.3–2. Disposal of produced water from federal leases would require prior approval, as outlined in Onshore Oil and Gas Order No. 7. BLM also would approve plugging and abandonment of wells, protection measures for hydrogen sulfide (if necessary), gas venting, gas flaring, and certain measures for handling production.

**Authorizing Actions**

A variety of federal, state, county, and local permitting actions would be required to implement any of the alternatives. Table 1–1 lists the major federal and state permits, approvals, and consultations likely to be required for the PRB oil and gas project. However, the list is not necessarily complete. In addition, various county and local permitting and approval actions may be required for any alternatives selected by the decision makers.

PRB O & G FEIS, Vol. 1 of 4, at 1–1—1–9.

Tiering is encouraged in the relevant federal regulations. Under NEPA regulations, tiering is a process in which environmental impacts addressed in a previous EIS may be briefly summarized and incorporated by reference in a subsequent document. 40 C.F.R. § 1502.20, entitled "Tiering," provides:

> Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review (§ 1508.28). Whenever a broad environmental impact statement has been prepared (such as a program or policy statement) and a subsequent statement or environmental assessment is then prepared on an action included within the entire program or

policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action. The subsequent document shall state where the earlier document is available. Tiering may also be appropriate for different stages of actions. (Section 1508.28).[5]

In this case, the "tiering" described is a comprehensive plan intended to manage and utilize federal lands and resources, built upon multiple considerations, multiple environmental assessments and impact statements, over an extensive period of time, consistent with the agency's multiple use directives. 40 C.F.R. § 1502.20 instructs agencies to tier their environmental impact statements and to "focus on actual issues ripe for discussion at each level of environmental review[.]" This provision continues by stating:

> Whenever a broad environmental impact statement has been prepared (such as a program or policy statement) and a subsequent statement or environmental assessment is then prepared on an action included within the entire program or policy (such as a site specific action) the subsequent statement or environmental

**5.** 40 C.F.R. § 1508.28, also entitled "Tiering," provides:

> *Tiering* refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared. Tiering is appropriate when the sequence of statements or analyses is:

> (a) From a program, plan, or policy environmental impact statement to a program, plan, or policy statement or analysis of lesser scope or to a site-specific statement or analysis.
> (b) From an environmental impact statement on a specific action at an early stage (such as need and site selection) to a supplement (which is preferred) or a subsequent statement or analysis at a later stage (such as environmental mitigation). Tiering in such cases is appropriate when it helps the lead agency to focus on the issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe.

assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action. The subsequent document shall state where the earlier document is available. Tiering may also be appropriate for different stages of actions.

40 C.F.R. § 1502.20.

The language of the PRB O & G FEIS and ROD at issue in this case demonstrates unequivocally that the agency will determine the scope of future site-specific proposals and engage in further environmental analysis. It is clear to this Court, upon a thorough review of the administrative record in this case, that tiering has occurred, and will occur, in this instance, in a manner consistent with the applicable regulations and agency policy. The programmatic EIS in this case describes the larger and general contours of the Powder River Basin Oil and Gas Project and its anticipated environmental impacts. It defers for future consideration impacts that may become apparent in the context of additional, later site-specific development and as the project changes over time.

Since this case was filed, the project has commenced and evolved to address concerns that have arisen. By way of example only, and solely for purposes of demonstrating how the programmatic EIS deferred certain matters for subsequent review and analysis, the Court notes that there has been ongoing review and revision of APDs and CBM projects in the State of Wyoming over time. Newspapers regularly report that agencies, private entities and concerned environmental groups continue to grapple with the grave issues that arise in conjunction with oil and gas and CBM development in the State of Wyoming.

These matters are never far from public scrutiny. For example, the Governor of the State of Wyoming issued Executive Order 2008–2, which recites:

WHEREAS THE Greater Sage–Grouse (*Centrocercus urophasianus*) is an iconic species that inhabits much of the sagebrush-steppe habitat in Wyoming; and

WHEREAS the sagebrush-steppe habitat type is abundant across the state of Wyoming; and

WHEREAS the State of Wyoming currently enjoys robust populations of Greater Sage–Grouse; and

WHEREAS the State of Wyoming has management authority over Greater Sage–Grouse populations in Wyoming; and

WHEREAS the U.S. Department of the Interior has been petitioned to list the Greater Sage–Grouse as a threatened or endangered species in all or a significant portion of its range, including those populations in Wyoming; and

WHEREAS the listing of the Greater Sage–Grouse would have a significant adverse affect on the custom and culture of the state of Wyoming; and

WHEREAS the listing of the Greater Sage–Grouse would have a significant adverse affect on the economy of the state of Wyoming, including the ability to generate revenues from state lands; and

WHEREAS the Wyoming State Legislature has appropriated significant state resources to conserve Greater Sage–Grouse populations in Wyoming; and

WHEREAS the state of Wyoming has endeavored to conserve Greater Sage–Grouse populations in order to retain management authority over the species through its statewide sage grouse working group, local sage grouse working groups and the efforts and initiatives of private landowners and industry; and

WHEREAS the Governor's Sage Grouse Implementation Team developed a "Core Population Area" strategy to weave the main on-going efforts to conserve the Greater Sage–Grouse in Wyoming into a statewide strategy; and

WHEREAS on April 17, 2008, the Office of the Governor requested that the U.S. Fish and Wildlife Service review the "Core Population Area" strategy to determine if it was a "sound policy that should be moved forward"; and

WHEREAS on May 7, 2008, the U.S. Fish and Wildlife Service responded that the "core population area strategy, as outlined in the Implementation Team's correspondence to the Governor, is a sound framework for a policy by which to conserve greater sage-grouse in Wyoming".

NOW, THEREFORE, pursuant to the authority vested in me by the Constitution and Laws of the State, and to the extent such actions are consistent with the statutory obligations and authority of each individual agency, I, Dave Freudenthal, Governor of the State of Wyoming, do hereby issue this Executive Order providing as follows:

1. Management by state agencies should, to the greatest extent possible, focus on the maintenance and enhancement of those Greater Sage–Grouse habitats and populations within the Core Population Areas identified by the Sage Grouse Implementation Team and modified through additional habitat and population mapping efforts.

2. Current management and existing land uses within the Core Population Areas should be recognized and respected by state agencies.

3. New development or land uses within the Core Population Areas should be authorized or conducted only when it can be demonstrated by the state agency that the activity will not cause declines in Greater Sage–Grouse populations.

4. Funding, assurances (including state-conducted efforts to development Candidate Conservation Agreements and Candidate Conservation Agreements with Assurances), habitat enhancement, reclamation efforts, mapping and other associated proactive efforts to assure viability of Greater Sage–Grouse in Wyoming should be focused and prioritized to take place in Core Population Areas.

5. State agencies should use a no-regulatory approach to influence management alternatives within Core Population Areas, to the greatest extent possible. Management alternatives should reflect unique localized conditions, including soils, vegetation, development type, climate and other local realities.

6. Incentives to enable development of all types outside Core Population Areas should be established (these should include stipulation waivers, enhanced permitting processes, density bonuses, and other incentives). However, such development scenarios should be designed and managed to maintain populations, habitats and essential migration routes outside Core Population Areas.

7. Incentives to accelerate or enhance required reclamation in habitats adjacent to Core Population Areas should be developed, including but not limited to stipulation waivers, funding for enhanced reclamation and other strategies.

8. Existing rights should be recognized and respected.

9. On-the-ground enhancements, monitoring, and ongoing planning relative to sage grouse and sage grouse habi-

tat should be facilitated by sage grouse local working groups whenever possible.

10. Fire suppression efforts in Core Population Areas should be emphasized, recognizing that other local, regional, and national suppression priorities may take precedent. However, public and firefighter safety remains the number one priority on all wildfires.

11. State agencies work collaboratively with the U.S. Fish and Wildlife Service, Bureau of Land Management, U.S. Forest Service, and other federal agencies to ensure, to the greatest extent possible, a uniform and consistent application of this Executive Order to maintain and enhance Greater Sage–Grouse habitats and populations.

12. State agencies shall work collaboratively with local governments and private landowners to maintain and enhance Greater Sage–Grouse habitats and populations in a manner consistent with this Executive Order.

Executive Order 2008–2.[6] See also e.g., the website of the Petroleum Association of Wyoming (PAW) addressing issues affecting Sage Grouse Management in Wyoming;[7] see Press Release for the Audubon Society,[8] discussing the Executive Order of the Governor of the State of Wyoming endorsing conservation of sage grouse, following months of work involving community leaders, conservationists, the energy industry and the agricultural community.

Similarly, issues regarding coalbed methane development and water use issues are being currently and frequently considered and addressed at the state agency level. For example, the website for the State of Wyoming, State Engineer, indicates that water issues relative to coalbed methane development in the Powder River Basin are being monitored.[9] These issues remain of great concern to numerous interested parties and are frequently the subject of newspaper reports.[10]

Wyoming state courts are struggling with water issues related to coalbed methane water production, including issues regarding the authority of the State Engineer to manage the state's groundwater, inclusive of water pumped to the surface in the production of coalbed methane. See e.g., *West et al. v. State of Wyoming, et al.*, appealed from First Judicial District Laramie County, Wyoming, to Wyoming Supreme Court, S–08–0161 and S–08–1062, docketed July 31, 2008.[11] As of the date of this writing, the appeals are still pending.

The point of these anecdotal, non-record items is to emphasize that the PRB O & G FEIS and Record of Decision recognize and acknowledge the complexity of the many issues arising during the course of the Powder River Basin Oil and Gas Project. They also demonstrate that resolution of those issues will require extensive engagement and participation of numerous interested entities and parties. These NEPA documents contemplated further, cooperative efforts between the private sector, industry participants, state and fed-

---

**6.** Text of the Executive Order can be found at http://governor.wy.gov/Proclamations.aspx.

**7.** Text at http://www.pawyo.org/html/home.htm.

**8.** Text at http://webl.audubon.org/news/press Release.php?id=780.

**9.** See e.g.: http://deq.st ate.wy.us/wqd/WYP-DES_Permitting/WYPDES_cbm.

**10.** See e.g.: http://www.denverpost.com/search/ci_6603026.

**11.** Reported at: http://casperstartribune.net/articles/2008/06/23/news/wyoming/79fc437d 19e798528725747000553d17.prt.

eral cooperating agencies and entities, and interested parties and persons, that would further consider and address environmental impacts that had not been anticipated, or that require further, other or different mitigation activities and measures not provided for in the Record of Decision and FEIS. This programmatic EIS provided for monitoring on an on-going basis, mitigation, and continuing cooperative efforts to address issues as they might arise over the life of the project that may not have been foreseen during the initial EIS process.

The programmatic EIS and ROD at issue in this case recognize that the process is not static and that it suffers from a certain amount of uncertainty and imperfect predictive abilities. These items also suggest that the approach adopted in this case, including requirements for further site-specific environmental analysis and mitigation, is appropriate and will be employed to make future decisions regarding coalbed methane development and drilling in the Powder River Basin.

 The Court finds and concludes that the plaintiffs' claims asserting violations of NEPA do not withstand scrutiny in this case. The voluminous administrative record in this case, which includes twenty compact disks of information, belies the assertion that the BLM did not take a hard look at the potential environmental consequences of the proposed project. The BLM is charged with managing public lands under principles of multiple use and sustained yield, in accordance with land use plans when available. 43 U.S.C. § 1732(a).

Although plaintiffs have attempted to fashion their claims so as to challenge the procedures utilized by the BLM in adopting the FEIS and ROD at issue in this case, it is not in reality such a challenge. Plaintiffs are actually challenging the BLM's programmatic EIS and the sub-

stantive decision to allow the project to proceed and its chosen alternatives for development. The alternatives were selected by the BLM in compliance with NEPA and the agency's statutory mandate to manage public lands in accordance with the principles of multiple use and sustained yield. See also FLPMA, 43 U.S.C. §§ 1702, 1732.

The NEPA process does not dictate that any particular conclusion or preference for land use be reached by the agency, as the parties seem to suggest in their written submissions. All that NEPA requires is that the agency reach an informed decision with respect to a proposed project and that there is sufficient discussion of the relevant issues and opposing viewpoints to enable it, as decision maker, to take a hard look at environmental factors and make a reasoned, fully informed decision. See *Custer County Action Association v. Garvey,* 256 F.3d 1024, 1034–1035 (10th Cir. 2001); *Natural Resources Defense Council, Inc. v. Hodel,* 865 F.2d 288, 294 (D.C.Cir.1988). The Court is convinced upon review of the voluminous record now before it that NEPA's requirements have in fact been satisfied and that the agency's decision adopting the FEIS/ROD for the Powder River Basin Oil and Gas Project is entitled to deference, was not arbitrary and capricious, an abuse of discretion or otherwise not in accordance with law, and is not in excess of the agency's statutory jurisdiction, authority, or statutory right. See *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 822–823, 28 L.Ed.2d 136 (1971).

In *Pennaco Energy, Inc. v. United States Department of Interior,* 377 F.3d 1147, 1150 (10th Cir.2004), the Tenth Circuit reminds that NEPA " 'prescribes the necessary process' by which federal agen-

cies must 'take a 'hard look' at the environmental consequences' of the proposed courses of action.... '[T]he statute does not impose substantive limits on agency conduct.' ... 'Rather, once environmental concerns are 'adequately identified and evaluated by the agency, NEPA places no further constraint on agency actions.''" (internal citations omitted). The case also discussed oil and gas leasing decisions:

> The DOI manages the use of federal oil and gas resources through a three-phase decision-making process. At the earliest and broadest level of decision-making, the DOI develops land use plans—often referred to as resource management plans (RMPs).... "Generally, a land use plan describes, for a particular area, allowable uses, goals for future condition of the land, and specific next steps." ... Under the Federal Land Policy and Management Act (FLPMA), "[t]he Secretary [of Interior] shall manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans ... when they are available." 43 U.S.C. § 1732(a).
>
> Once an RMP has been issued, "subsequent more detailed or specific planning, shall conform to the [RMP]." 43 C.F.R. § 1610.5–3(a). In the context of oil and gas development, the BLM is initially charged with determining whether the issuance of a particular oil and gas lease is consistent with the RMP. The lessee must obtain BLM approval of an Application for Permit to Drill (APD) before commencing any "drilling operations" or "surface disturbance preliminary thereto." 43 C.F.R. § 3162.3–1(c).

*Pennaco,* 377 F.3d at 1151–1152 (most internal citations omitted). That opinion then went on to consider whether the BLM had satisfied the NEPA requirements regarding issuance of leases in the Buffalo RMP EIS and Wyodak EIS, and upheld the decision of the IBLA finding that the water quality issues arising out of CBM development had not been sufficiently considered prior to issuing the leases. The instant case is distinguishable in that it is a post-leasing case implicating substantially different issues than those that arise in a pre-leasing situation.

This Court is also mindful that under the APA the only agency action that can be compelled is action that is legally required. The United States Supreme Court has stated that:

> ... § 706(1) empowers a court only to compel an agency to 'perform a ministerial or non-discretionary act,' or "to take action upon a matter, without directing *how* it shall act." ...

Thus, a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take.* These limitations rule out several kinds of challenges. The limitation to discrete agency action precludes the kind of broad programmatic attack we rejected in *Lujan v. National Wildlife Federation,* 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). There we considered a challenge to BLM's land withdrawal review program, couched as unlawful agency "action" that the plaintiffs wished to have "set aside" under § 706(2).... We concluded that the program was not an "agency action":

> "[R]espondent cannot seek *wholesale* improvement of this program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made. Under the terms of the APA, respondent must direct its attack against some particular 'agency action' that causes it harm." ...

The plaintiffs in *National Wildlife Federation,* would have fared no better if they had characterized the agency's alleged "failure to revise land use plans in proper fashion" and "failure to consider multiple use," ... in terms of "agency action unlawfully withheld:" under § 706(1), rather than agency action "not in accordance with law" under § 706(2).

The limitation to *required* agency action rules out judicial direction of even discrete agency action that is not demanded by law (which includes, of course, agency regulations that have the force of law). Thus, when an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to action, but has no power to specify what the action must be. For example, 47 U.S.C. § 251(3)(1), which required the Federal Communications Commission "to establish regulations to implement" interconnection requirements "[w]ithin 6 months" of the date of enactment of the telecommunications Act of 1996, would have supported a judicial decree under the APA requiring the prompt issuance of regulations, but not a judicial decree setting forth the content of those regulations.

\* \* \* \*

The principal purpose of the APA limitations we have discussed—and of the traditional limitations upon mandamus from which they were derived—is to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve. If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved—which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management. To take just a few examples from federal resources management, a plaintiff might allege that the Secretary had failed to "manage wild-free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance," or to "manage the [New Orleans Jazz National] [H]istorical [P]ark in such a manner as will preserve and perpetuate knowledge and understanding of the history of jazz," or to "manage the [Steens Mountain] Cooperative Management and Protection Area for the benefit of present and future generations." ... The prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA.

*Norton v. Southern Utah Wilderness Alliance,* 542 U.S. 55, 64–67, 124 S.Ct. 2373, 2379–2381, 159 L.Ed.2d 137 (2004) (most internal citations omitted).

As to the argument that the result in this case was predetermined and a violation of NEPA, the Court does not find it to be persuasive. The environmental analysis performed in this case, as embodied in the FEIS and ROD, reflects amendments to the 1985 RMP so as to provide for the use of BLM administered lands and federal mineral estates under the conditions described and analyzed in the FEIS. The decision selecting among various alternatives reflects the difficulties in accommodating the vast array of competing interests and the huge diversity of public opinion regarding the use of these public lands, impacts to wildlife and their habitat, and administration of the federal mineral estate. It is, inevitably, an imper-

fect attempt to accommodate a variety of interests and is unquestionably, at least to some extent, a compromise solution.

The decision is not one that was predetermined by the method of analysis utilized to reach the decision. The agency received public input at hearings and in protests and comments;[12] several alternatives were in fact considered. The record does not support the conclusion that the result was predetermined by any method of analysis. *See Silverton Snowmobile Club v. United States Forest Service*, 433 F.3d 772, 780–781 (10th Cir.2006); *Forest Guardians v. Forsgren*, 478 F.3d 1149 (10th Cir.2007) [challenge by environmental groups to compel United States Forest Service, pursuant to Endangered Species Act ("ESA"), to consult with Fish and Wildlife Service on question of whether the Land and Resource Management Plans ("LRMP") for the Carson and Santa Fe National Forests may jeopardize the continued existence of the Canada Lynx; finding the allegation of agency action in the complaint insufficient to sustain the ESA claim, rejecting Ninth Circuit position that LRMP constitute continuing agency action, noting that LRMPs are a "framework for making later project decisions rather than .... a collection of project decisions."]

█ The choice of Greystone as contractor is not an action that would evidence a compromise of the BLM's objectivity and integrity in the exercise of its administrative responsibilities in this case. The administrative record that is before the Court discloses the NEPA process in this case was controlled by the BLM and that the BLM did preserve its integrity and objectivity. Plaintiffs have suggested that Greystone may have operated under a conflict of interest and it was not an appropri-

ate choice for contractor to engage in activities with respect to the at-issue EIS. There is no evidence in the record suggesting that the BLM did not exercise control over the project; there is little evidence to support plaintiffs' arguments in this regard. However, accepting solely for purposes of this argument that the contractor used to prepare the EIS may have operated under a conflict of interest, the Tenth Circuit has stated:

The procedural requirements of NEPA and its implementing regulations are designed to force agencies proposing to take any action that will affect the natural environment to take a "hard look" at the environmental consequences. *See Robertson*, 490 U.S. at 350, 109 S.Ct. 1835. When reviewing an EIS prepared by a contractor who has allegedly breached a requirement imposed by 40 C.F.R. § 1506.5(c), the ultimate question for the court is thus whether the alleged breach compromised the " 'objectivity and integrity of the NEPA process.' " *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 202 (D.C.Cir.1991) (quoting *Forty Questions*, 46 Fed. Reg. at 18,031); *see Holy Cross [Wilderness Fund v. Madigan ]*, 960 F.2d [1515] at 1529 [ (10th Cir.1992) ] (concluding that, although procedure followed deviated from "typical order of events" in a NEPA case, circumstances led to conclusion that agency had taken the requisite "hard look" at environmental factors); *Northern Crawfish Frog (Rana Areolata Circulosa) v. Federal Highway Admin.*, 858 F.Supp. 1503, 1529 (D.Kan. 1994); *Sierra Club v. Marsh*, 714 F.Supp. 539, 583 (D.Me.1989); *see also Brandon v. Pierce*, 725 F.2d 555, 563–64 (10th Cir.1984) (holding prior to passage of CEQ regulations that contractor's ap-

12. See e.g., by way of example only, WY BLM AR for PRB EIS, A.R. at CD # 1 of 20, background, preplanning guidance and comments; A.R. at CD # 6 of 20, 2738–3695, FEIS Protest letters and responses.

parent conflict did not mandate invalidation of environmental assessment so long as the agency does not substitute the contractor's judgment for its own), *overruled on other grounds by Village of Los Ranchos De Albuquerque v. Marsh,* 956 F.2d 970, 973 (10th Cir.1992) (en banc); 40 C.F.R. § 1500.3 ("[I]t is the [CEQ]'s intention that any trivial violation of these regulations not give rise to any independent cause of action."). Therefore, when an EIS is challenged on the basis of an alleged conflict of interest that is known to the agency, we agree with the district court "that the Court can evaluate the oversight that the agency provided to the environmental impact statement process as a factual matter and make a determination upholding the environmental impact statement." . . . .

*Associations Working for Aurora's Residential Environment v. Colorado Department of Transportation,* 153 F.3d 1122, 1129 (10th Cir.1998). Such evidence is notably absent in the administrative record in this case.

This is a programmatic decision. The Record of Decision provides a framework for continuous BLM oversight, from the beginning of the project through the end of the project, including reclamation. The Record of Decision does not provide for or grant any well approvals; no site specific proposals are approved in this Record of Decision. Site specific plans of development from operators require BLM approval as well as approvals from the State for Wyoming for purposes of Clean Air Act and Clean Water Act compliance. Site specific restrictions are contemplated and provided for with respect to prairie dogs and sage grouse, including by way of example, buffer zones for sage grouse or requiring avoidance of prairie dog colonies—requirements which may be changed or revised in the future if circumstances warrant. The Record of Decision provides

for water management plans and mitigation agreements which were jointly developed with the input of the Powder River Basin Council, the BLM, and the companies seeking to engage in these CBM development projects. The Record of Decision provides for mitigation monitoring and reporting, creates the Powder River Basin Working Group (see Appendix E of the Record of Decision), to consider these issues. There are thousands of pages of information, studies, comments, proposals, and comments that were compiled over a period of three years. It is difficult to say that NEPA's procedural requirements have not been satisfied, given this volume of material to consider and review.

■■■ While the Court has declined to address each and every one of the plaintiffs' multiple arguments in this opinion, the foregoing discussion makes clear that the plaintiffs' arguments are not persuasive and that the agency action has not been shown to be arbitrary and capricious, an abuse of discretion or not in accordance with law. Having waded through the stream of the alphabet soup in this administrative record, the Court finds and concludes that the agency has provided a reasoned basis for its decision and the decision is supported by facts in the record. Under any of the standards articulated above, including the arbitrary and capricious standard or an otherwise-described NEPA "reasonableness" standard, the Court believes the record is sufficient to support the BLM's decision to permit the Powder River Basin Oil and Gas Project to proceed, with additional site-specific environmental analysis to be required as the project proceeds. The agency's decision is entitled to deference and this Court is not in a position to second-guess those decisions or to say that the adaptive management process envisioned by this Record of Decision has not worked. The Court concludes that the agency acted within the scope of its

authority, complied with prescribed procedures, examined relevant data and articulated a rational connection between facts found and the decision made. To the extent that other issues are raised in the briefing, they are deemed denied and incorporated into this decision affirming the agency's action in this case.

Accordingly, the relief sought by plaintiffs in Case No. 04–CV–18J and Case No. 04–CV–19J will be denied and the agency decision will be affirmed. It is therefore

**ORDERED** that the agency action challenged in Case No. 04–CV–18J and Case No. 04–CV–19J shall be, and is, **AFFIRMED.** It is further

**ORDERED** that all pending motions to supplement the record shall be, and hereby are, **DENIED.**